# · CHARLESTON.

MAXWELL *et al. v.* CUNNINGHAM *et al.*

Submitted June 17, 1901.   Decided November 30, 1901.

1. EJECTMENT—*Plaintiff's Recovery—Instruction.*

When the jury in an action of ejectment has been instructed distinctly and fully upon the doctrine that the plaintiff must recover on the strength of his own title and cannot be aided by the weakness of the title of his adversary, it is unnecessary to again give such instruction in connection with an instruction asked by plaintiff expounding the law as to what is necessary to be shown by a defendant who relies on adverse possession of land under color or claim of title to defeat the legal title of the plaintiff.   (p. 316).

2. CLAIM OR COLOR OF TITLE MUST BE SHOWN.

One claiming title as against the legal owner is bound to show his color or claim of title and that it covers the land or part of the land in controversy; that he entered under said color or claim of title upon the said land or some part of it; that his entry was hostile and adverse to the party having the legal title, and was actual, visible, exclusive and unbroken under said color or claim of title for ten years before the commencement of the action against him.   (p. 316).

3. ADVERSE CLAIM—*Possession—Boundaries.*

One so holding adversely under *claim* of title for ten years before the commencement of the action will be limited in his adverse holding to his actual enclosures, if under *color* of title the adverse holding will extend to the boundaries contained in the deed or writing constituting his color of title.   (p. 318).

4. ADVERSE POSSESSION—*Disclaimer.*

Or, when one has entered and held under another, before his possession can become adverse there must be an express disclaimer or its equivalent and the assertion of an adverse title with notice to the owner.   (p. 319).

5. CONTIGUOUS TRACTS—*How Taxed.*

An owner of several tracts of land lying contiguous to each other should have them entered and charged with taxes on the land book as a whole and not in different parcels.   (p. 320).

6. EJECTMENT—*Defense—Outstanding.*

If the defendant in an action of ejectment relies upon setting up an outstanding title for the purpose of defeating the action, whether in the State by forfeiture or otherwise, he

must affirmatively and clearly establish such title as an actual and subsisting and better title than the plaintiff's title—such title as would enable the third party himself to maintain an action for the possession of the lands in controversy against both the plaintiff and defendant. (p. 321).

Error to Circuit Court, Ritchie County.

Action by Leeman Maxwell and others against W. J. Cunningham and others. Judgment for plaintiffs, and defendants bring error.

*Affirmed.*

CYRUS HALL, S. ROBINSON, P. W. MORRIS and HOMER ADAMS, for plaintiffs in error.

EDWIN MAXWELL and MILLARD SNIDER, for defendants in error.

McWHORTER, JUDGE:

This is an action of ejectment for four hundred acres of land in Ritchie County instituted by Leeman Maxwell, Porter Maxwell, Lewis Maxwell, and W. Brent Maxwell in the circuit court of Ritchie County against W. J. Cunningham, W. A. Cunningham, W. R. Cunningham, B. F. Cunningham and Peter Cunningham. At the May rules, 1897, the defendants appeared, demurred to the declaration and plead not guilty. The plaintiffs joined in the demurrer and joined issue on the plea. On the 25th of June, 1897, an order of survey was made on motion of the plaintiffs and on the 17th of February, 1898, the report of the surveyor, Clayton, made and filed in the cause; being incomplete, on motion of plaintiffs said report and plat were set aside and the case recommitted to surveyor Clayton to fully execute the order of survey theretofore made and by agreement of parties the case was continued.

On the 25th day of October, 1899, the parties appeared by their attorneys and the defendants by their attorney and entered the plea of not guilty, and put themselves upon the country and the plaintiffs likewise. A jury was then duly impaneled and sworn. On the 26th of October the parties and the jury again appeared and after hearing further evidence P. W. Morris, attorney for defendants "announced that on yesterday he had inadvertently entered the plea of not guilty on behalf of W. J.

Cunningham and W. A. Cunningham and desired to withdraw the same, which plea of not guilty entered on yesterday on behalf of said defendants W. J. Cunningham and W. A. Cunningham, is withdrawn, and after hearing further evidence the jury is adjourned over until to-morrow morning at nine o'clock." The next day the parties again appeared by their attorneys, and the defendants W. J. Cunningham and W. A. Cunningham by counsel moved the court to continue the cause as to them, which motion the court overruled and said defendants by C. A. Harrison their counsel plead not guilty and the trial proceeded from day to day until the first day of November, 1899, when the jury returned a verdict for the plaintiffs for a certain part of the land described by them and for the defendant B. F. Cunningham a certain other part. The defendants moved the court to set aside the verdict because contrary to the law and the evidence and grant them a new trial, which motion the court overruled and entered judgment upon the verdict. The defendants tendered several bills of exceptions to the ruling of the court numbered respectively one to eleven inclusive which were filed and made part of the record.

The defendant B. F. Cunningham obtained a .writ of error and *supersedeas* to said judgment assigning some twenty causes of error. The first assignment is that the court erred in overruling defendant's motion to set aside the verdict and grant a new trial; and second in entering up judgment on the verdict and refusing to grant a new trial; third, in giving to the jury plaintiffs' instruction number two; fourth and fifth in giving plaintiffs' instruction number five; and sixth, seventh and eighth in giving plaintiffs' instructions six, eight and one respectively; the ninth, tenth and eleventh assignments that the court erred in refusing to give to the jury defendants' instructions five, seven and eight respectively; the twelfth that the court erred in permitting the trial of the case to go on one day without a plea of not guilty as to part of the defendants; thirteenth in holding that the plaintiffs had sufficiently identified their land by their title papers "when as a matter of fact their title papers did locate their land in another and different locality than that of the land in controversy;" fourteenth that the court erred in. not treating the injunction proceedings in regard to this land as an injunction perpetuated; fifteenth in holding that although the defendants had had the ownership and possession of said

land at least under color of title from 1842 to that time, and
although they had paid the taxes thereon yet the plaintiffs could
recover under the evidence in this case; sixteenth in overruling
demurrer to the declaration; seventeenth in holding that pay-
ment of taxes on one tract of land is payment on another if it be
coterminous; eighteenth in holding that the *onus* or burden was
on the defendants to show that the tract of four hundred acres
in controversy was not in some tract of land taxed to the plain-
tiffs in said assessment district in the same county, when the
plaintiffs should have been compelled to show that said particu-
lar tract was on the land books of said county; nineteenth in
holding that said land was not forfeited for the non-entry and
non-payment of taxes thereon; twentieth in holding that the
plaintiffs could recover a part and not all the land sued for. The
instructions 2, 5, 6, 8 and 1 of plaintiffs complained of are as
follows: No. 2. "The jury are further instructed that if the ad-
verse possession should be held as in the above instruction for
ten years before the commencement of the action under claim of
title, the person claiming adversely will be limited in his ad-
verse holding to his actual enclosures, if under color of title then
the adverse holding will extend to the boundaries contained in
the deed or writing that constitutes his color of title." No. 5.
"The jury are further instructed that if a person has his land
charged upon the land books in a large tract that covers all his
smaller tracts or any of his smaller tracts, it is not necessary for
him to have it charged to him in the small tracts, and no for-
feiture can accrue to those small tracts by reason of their not
being so charged as small tracts if they are included in the large
tracts.   In other words, coterminous tracts of land belonging
to the same person for the assessment and payment of taxes are
the same as one tract." No. 6. "The jury are further instructed
that forfeitures are deemed odious in law and will never be pre-
sumed but must be strictly proved by the party relying on the
same.   And before the defendants can have the benefit of the for-
feiture claimed by them or any of them for a failure of the
plaintiffs or those under whom they claim to have had the land
in controversy placed upon the land books in Ritchie County
and pay the taxes thereon for five successive years after the year
1869, the defendants must clearly prove that the said land or
any part thereof in controversy has not been upon the land
books for those years, neither in large tracts nor small ones."

No. 8. "The jury are further instructed that the defendants to make out a title by adverse possession, must show that such possession was adverse in its inception, and where the entry is under the title of the legal owner, the holder cannot controvert that title without an express disclaimer, or its equivalent, and the assertion of an adverse title with notice to the owner." No. 1. "The jury are instructed that the party who relies on adverse possession of land, under color or claim of title, to defeat the legal owner of the land must show: 1. His color or claim of title and that it covers the land, or a part of the land, in controversy. 2. That he entered under said claim or color of title upon said land in controversy, or some part thereof. 3. That his entry was hostile and adverse to the party having the legal title and was actual, visible and exclusive, and, 4. Must have so continued hostile, actual, visible and exclusive, unbroken, under said color or claim of title for ten years before the commencement of the action to dispossess him."

The defendants' instructions which he contended should have been given Nos. 5, 7 and 8 are as follows: No. 5. "Any person claiming the title to land vested in the State under the second class specified in section 3, Article XIII of the Constitution or under the Act of 1873, need not have had any possession to enable him to hold." No. 7. "The jury are instructed that while a person may place one tract embracing several small tracts of land on the land books and have the same assessed as a single tract, yet when such person attempts to show payment of taxes on one of the smaller tracts he must show and prove that such smaller tract is embraced within, and is part of the single tract. Now unless the jury believe from the evidence in this case that the land in controversy is embraced within one of the tracts charged on the land books in the name of the plaintiffs and has not become forfeited then the jury must find for the defendants." No. 8. "The jury are instructed that in an action of ejectment the plaintiff, if he recover the land sued for, must recover on the strength of his own title, and not on the weakness of the title of the defendants; and that no matter how weak the defendants' title to the land is, this fact cannot aid the plaintiffs in making out the case, and that in this action the burden of proving the case by a preponderance of the testimony, is on the plaintiffs, and if it is not shown by the plaintiffs by a preponderance of the evidence that the land in controversy has been

entered and put on the land books of this county in the name of
the plaintiff and thereon taxed, and the taxes assessed thereon
paid, by the plaintiffs, then as a matter of law said land would be
forfeited; and if it should appear to the satisfaction of the jury
that for any term of years, as much as five or more, that said
land was not so entered and taxed, then the said land would be
forfeited; and if the jury should further believe that the plain-
tiffs paid large sums of money as taxes, on other lands, in the
same district; yet, if these lands did not, in the opinion of the
jury, cover said land, to-wit: the land in controversy, then that
such payment of taxes would not operate to keep the tract of
land in controversy from a forfeiture; and the jury are further
instructed that, if the defendants in this case rely on possession,
that the same must be adverse, open, hostile, notorious, exclusive
and continuous for more than ten years, under color of title; but
if the jury believe that the defendants under color of title have
had such possession of the land in controversy, then that posses-
sion under the color of title aforesaid, under our law, gives to the
said defendants, if in addition to said color of title and posses-
sion, the said defendants have paid taxes thereon, a good and
sufficient title in law and equity."

As to the first and second assignments in refusing to set aside
the verdict because the same was contrary to the law and the evi-
dence and entering up judgment on the verdict. Plaintiffs in-
troduced in evidence a grant to Marsh and Waldo dated the 3rd
of June, 1790, for nine hundred and sixty acres, also a grant to
Henry Banks dated the 20th day of December, 1784, for three
thousand eight hundred and forty acres, the grant of nine hun-
dred and sixty acres covered the Banks grant to the extent of
five hundred and sixty acres. P. G. VanWinkle, commissioner of
delinquent and forfeited lands for the county of Ritchie, on the
26th of March, 1844, filed his report in the circuit superior court
of law and chancery for said county showing that said four hun-
dred acres was liable to sale as forfeited for non-entry and the
same was sold by said commissioner under a decree of said court
and purchased by Lewis Maxwell and conveyed to him by said
commissioner by deed dated the 3rd day of March, 1846, which
deed and record of the proceedings were also introduced in evi-
dence by plaintiffs, also deeds from all the other devisees of
Lewis Maxwell to Franklin Maxwell for all their right, title and
interest in the estate of Lewis Maxwell both real and personal,

also title papers for various other tracts, large and small, situated in Ritchie County in Murphy district beginning with the grants therefor and vesting finally in Lewis or Franklin Maxwell, the latter the father of plaintiffs from whom they inherit. Surveyor reported that he commenced at a stake in the Robert Lilburn line, a line called for in the Marsh and Waldo patent for nine hundred and sixty acres and proceeded to run off the Maxwell four hundred acre tract claimed by plaintiffs the subject of this action and bounded by lines shaded red and lettered AB, BD, DE, and EA; that he found the line AB well marked and blocked and found the W. O. pointers at B marked and blocked the morning of September 24. After some further surveying adjourned and met again, plaintiffs and defendants being present, and at the request of defendants they began at a Sour Gum, marked F on the plat, which was agreed to by all the parties as being a corner to the Marsh and Waldo tract, which tract was laid down on the plat. Surveyor Clayton says he ran all around the survey of the John A. Lowther tract of two hundred and thirty-six acres taking the calls from the patent to John A. Lowther dated the first day of July, 1853, and which was put in evidence in the case. They found no tree marked on the line except a few along the lines M and N, the lines nearly all being in open field; that Dr. Rexroad owned part of it as he was informed and there were other farms—B. F. Cunningham owned part of it—thinks B. F. Cunningham's barn is partly on the survey—the line run through his barn—"Yes, B. F. Cunningham lives in this Lowther survey in the sharp three-cornered piece close to the letter M." Witness stated that they surveyed and laid down on the map the J. D. Wilson tract of nine hundred and sixty acres and read the courses and distances from the patent—says they found several corners around the survey and marked lines; and further says "It is a well identified survey to be an old survey, because when you run in open fields and finally come to the corners again it is proof beyond any doubt." John W. Cain, a surveyor of considerable experience in Ritchie County who attended the survey made by surveyor Clayton, says he pointed out the place to start the survey of the four hundred acre tract on the Lilburn line; witness was acquainted with many of the lines; had known that to be called the Lilburn line for a long time, fifteen or twenty years, thinks it had been that long. This witness identified the corner marked H on the map,

at a maple and the line thence to G and on crossing Indian creek passing E to the letter A as the Lilburn line, and states that the line A to B run by Clayton from point at the corner of the tract marked "Amos Scott" northward it was a well marked line, to the letter B; that he had run that line some five, six or seven years before in a controversy between Morris, Scott & Co. and Tom Davis and blocked some trees and counted, he thinks, sixty-seven growths. Was with surveyor Clayton when he surveyed the Marsh and Waldo nine hundred and sixty acres; he thinks that William Cunningham was the man that had it done —don't know whether it was done at Ben's request or not. They went to the Sourwood corner, Mr. Prunty, William Cunningham, Ben Cunningham, Sam Cunningham and another or two— Ben's boys likely, and Amos Scott and Lafe Bickerstaff were along in the drove. Witness was asked if he heard Cunningham say anything about that being the Marsh and Waldo corner, he answered: "They all claimed it was the Marsh and Waldo corner, the Sourwood corner," and stated that starting from that corner at the letter F to letter G then to A, then to B, and back to F would properly lay down the nine hundred and sixty acres as it is laid down on the map. On the cross-examination witness was asked to explain where the Wilson land interlocked on the four hundred acre piece which was part of the Waldo tract and crossed and covered the land or part of the land in controversy. He replied, from point L around to the point marked a sugar covered all the Abraham Cunningham tract except the space with the L inside, from L south on the red line to the forks of Indian creek, that is the interlock of J. D. Wilson on the four hundred acre piece. Witness was asked "If the old Banks line as it is claimed by Cunningham is the true Banks line how would it run, —the John A. Lowther tract?" A. "To run by course and distance it is laid down exactly on the plat as it would run." Q. "If from I to R is the true Banks line would not this Lowther survey run from O to I on the north line?" A. "My recollection is that it calls for running with the Banks line and if the true line from I to R, in that case I would extend the line to it." Q. "Is not Mr. Cunningham in possession of the land from I to K and from L to the stone pile with the blue line; has he not possession of that rectangular piece claiming it under the Lowther patent?" A. "His would extend out to the line from I to R. He has that land partly cleared out and has buildings

on that land, and I think he has some buildings on this part of it marked 'B. F. Cunningham' between D and P. The principal part of his body of land is cleared out and houses and buildings on it." With reference to the Banks land being properly represented as claimed by defendants by the letter I to R, witness says: "My recollection was that Mr. Cunningham, when I was running this twenty thousand acres out, he told me the letter I was the place. I went to that place and I had this white oak pointed out and I knew where the reputation of the Banks line put it. I run on his say so a certain distance and concluded that was wrong. My distance run out before I got to the point P from the black oak. I moved over on the line then from P to E. The description that caused me to do that—this says south nine hundred and sixty poles crossing a creek and a run, and that is what helped me get it into my head that that was the Banks line. Mr. Clayton run on a variation of four degrees. By running the other line you would cross Indian creek five times before running the distance out to the hickory, and if you crossed any run at all it would be away below there, and I am not certain whether it would hit any run at all." And he further said on cross-examination that the Cunninghams had been living in that region ever since he knew them some fifteen or twenty years and that the house that Peter Cunningham lives in under B. F. Cunningham is between the yellow line on the east and the red line or the line from P to E, which plaintiffs claim as the true line or not far from those figures—some places it is cleared to that line—the most of it is cleared out and fenced. When asked on re-direct examination, "Do you mean to say that W. R. Cunningham has had his house on the one hundred and thirty-three and three-fourths acres?" A. "No sir, not in that neck of woods." And he further answered "W. R. Cunningham's house was built there two or three years ago. B. F. Cunningham lives inside of that corner and he has lived in there ever since I can recollect of being in there, that is outside of the four hundred acre tract." Q. "There is where you meant to say the Cunninghams lived in that country?" A. "That is the only point that I could say that Cunningham has lived is in that house. The others I have seen around there, but not over three years ago was when I had the first knowledge of the Abraham Cunningham house." Q. "Then so far as your knowledge goes of their oc-

cupying and having cleared or enclosed any part of the four hundred acres that is described in the declaration it has been about three or four years ago?"   A.   "Not much longer than that, it seems to me that it might not be longer than four years ago."

Alex Prunty, a witness who attended the survey, says: "That Marsh and Waldo tract was surveyed at the suggestion of the defendants in this suit, and the corner, the sour gum at F, was pointed out by the Cunninghams," and that the Marsh and Waldo survey was run out from that point. He further stated that B. F. Cunningham and W. J. Cunningham pointed out where Philip Cox and Daniel Sherwood run the Banks line from P to E.  Amos Scott, chain carrier, also testifies to the same facts concerning the sour gum corner to the nine hundred and sixty acre survey that Wm. Cunningham and Ben F. Cunningham took them to the said corner and that it was at their suggestion that the Marsh and Waldo tract of nine hundred and sixty acres was surveyed, also corroborated by Lafayette Bickerstaff, a chain carrier.  So that it appears that the four hundred acres claimed by plaintiffs is a part of the Marsh and Waldo patent of nine hundred and sixty acres, the residue of five hundred and sixty acres being included in the Banks three thousand eight hundred and forty acre grant, and the four hundred acres sold as forfeited to the State and purchased by Lewis Maxwell and conveyed to him by commissioner of forfeited and delinquent lands, VanWinkle.

The defendants offered in evidence a deed from C. J. Stuart, special commissioner, to B. F. Cunningham dated November 8, 1887, for one hundred and four acres of land, being part of the two hundred and thirty-six acres belonging to the estate of John A. Lowther; also a deed dated March 25, 1896, from D. M. V. Philips to B. F. Cunningham for ninety-eight and three-fourths acres, more or less, with special warranty; also deed dated March 10, 1896, from H. C. Showalter, special commissioner, to D. M. V. Philips for the same tract of ninety-eight and three-fourths acres.  The plaintiffs objected to all of such deeds going into evidence but the objection was "overruled for the present" and admitted as color of title; also introduced the record in a chancery cause of B. F. Cunningham, administrator of Abraham Cunningham, against Nancy Ayers in which proceeding the ninety-eight and three-fourths acre tract was decreed to be sold and in

which the commissioner Showalter was appointed to make the conveyance introduced as evidence. Defendants also introduced an article of agreement between Samuel Clevenger and Abraham Cunningham dated the 19th of February, 1842, whereby Clevenger agreed to make to said Cunningham a deed to a certain tract or parcel of land lying "on the north side of Indian creek in the county of Wood, the same that the said Cunningham has been improving" and describing the boundary containing one hundred acres, more or less, which was also admitted as color of title over the objection of the plaintiffs. The defendants then introduced as a witness W. R. Meservie, clerk of the county court of Ritchie County, and asked him to "state whether or not you find taxed to Franklin Maxwell, or the heirs of Franklin Maxwell, on that book (referring to the land book for 1869, 1870, and 1871 in Ritchie County) any tract of four hundred acres in Murphy district, or any tract of three thousand eight hundred and forty acres, or to Lewis Maxwell's estate?" "We want to know from this clerk whether he finds on these books any tract of four hundred acres charged with taxes in the name of Lewis Maxwell's estate, in the name of Franklin Maxwell, Leman Maxwell, Porter Maxwell, Lewis Maxwell or W. Brent Maxwell, or the heirs of Franklin Maxwell deceased?" An objection by the plaintiffs to the question was overruled and the plaintiffs excepted. The clerk answered in the negative as to both of said tracts and as to each of the years from 1869 to 1899 inclusive and the said land books for said years (1869 to 1899) were also put in evidence from which books it does not appear that a tract of four hundred acres or a tract of three thousand eight hundred and forty acres or either of them were on said books for those years as separate tracts, but it does appear that they were charged on said books for many of said years besides various other small tracts of three hundred acres and less, three large tracts of four thousand two hundred and seventy, five thousand seven hundred and sixty, and two thousand and eighty-eight acres respectively in Murphy district in said county, which three tracts remained on said books up to and including 1892 and in the year 1893 the four thousand two hundred and seventy acre tract was reduced to three thousand eight hundred and ninety-nine; in 1894 there were on said books besides small tracts nine hundred and eighty, two thousand three hundred and fifty, and one thousand six hundred and eighty acres; and for 1895 and 1896 they were charged at sub-

stantially the same amount of acres; in 1897 there was charged a tract of eight hundred and fifty acres on the waters of Indian creek and Blood run in said district and county; besides various other tracts ranging from three hundred and fifty-five acres down; in 1898 there was charged six hundred and fifty acres on the waters of Indian creek and Blood run besides various other small tracts; and in 1899 the same. All these charges were to the heirs of Lewis Maxwell. Defendants also introduced the land books for the years 1888 to 1899 inclusive showing that B. F. Cunningham was charged in said Murphy district on Indian creek with a tract of one hundred and four acres and for the years 1896 to 1899 inclusive he was charged also with ninety-eight and three-fourths acres on Indian creek and one hundred and ten acres on Indian run, etc. The ninety-eight and three-fourths acres being conveyed by Philips and the one hundred and ten acres by W. Brent Maxwell and others; and it is shown also by said books that Abraham Cunningham's heirs were charged in said district with ninety-eight and three-fourths acres on Indian creek for the years 1888 to 1895 inclusive derived from "Scott commissioner." The defendants also offered in evidence the decree in the cause of Franklin P. Lowther against James C. Wise et al. showing partition of the land belonging to the estate of John A. Lowther deceased; also another decree in the same cause confirming the report of sale of the two hundred and thirty-six acre tract to·Zebulon Rexroad and B. F. Cunningham, an exception to the introduction of which by the plaintiffs was overruled. Defendants offered in evidence a deed from Benjamin F. Cunningham and wife to William R. Cunningham dated July 3, 1895, for a tract of one hundred and thirty-three and three-fourths acres of land on Little Indian run, a branch of Indian creek in said Murphy district, and also a deed from W. J. Cunningham to W. A. Cunningham dated February 7, 1895, but which deed is not copied into the record, (clerk certifies not found in the papers). B. F. Cunningham testified that as to the one hundred and four acre tract he commenced improving it in 1873, had cleared out that land, fenced it, sowed it in grass, plowed up some of the grass and paid the taxes, built a house on it in 1873, and Jacob Mullenax lived in it under him from 1873 to 1880 or 1881; that he and Mullenax had a contract for it with Jacob Allender and the Lowther boys, Franklin, Harvey and Wilson, heirs of John A. Lowther. Allender was their step-

father and guardian. After 1873 cleared land, cropped it, took
the timber off and fenced it, which he did as fast as he could get
the work done from year to year, put up grainhouse, corn crib
and a horse and cow stable, has a small orchard on it planted
by Jacob Mullenax. The evidence was conflicting as to the true
line of the Banks survey, the defendants claiming it from "I"
to "R," the plaintiffs from "P" to "E" with the evidence of the
surveyors strongly preponderating in favor of the latter. The
defendants introduced evidence tending to prove that at some
time in the "fifties" Lewis Maxwell brought suit against Abra-
ham Cunningham for land, and Barnett Cunningham testifies
that "My father and Lewis Maxwell had a law suit, when that
suit was instituted I could not tell you. The first of my recollec-
tion there was a law suit in court. Father had a lawyer in court
and the lawyer didn't appear and Maxwell got a judgment
against him. Then my father feed another lawyer and filed a
bill of injunction and it went on so in court as well as I remem-
ber until about the time that I was married. Some time in the
seventies it was thrown out of court;" that his father stayed on
the land, and that his father paid taxes on the land. Witness
Cyrus Hall testifies away back in the fifties Abraham Cunning-
ham employed him in the case to assist in defending his title to
what he claimed, did not remember what the title was; that he
knows he was employed by Abraham Cunningham and after that
there was an injunction proceeding; that he prepared the in-
junction for Cunningham in regard to his land, and one for Sig-
ler who claimed the tract adjoining it on which Mr. Scott now
resides. It was known then as the Clevenger land; that he must
have got the injunction in some proceeding against Lewis Max-
well, but could not then remember what the facts were, and
knows that up to 1861 the bill was never answered, no answers
were ever made; that the present clerk, Mr. Lininger, had made
search for the papers in his office and was unable to find them,
and the suits were dismissed from the docket.

It was also shown from the records that on the 22d day of
October, 1873, seven chancery causes among which was one
styled *Abraham Cunningham* v. *Lewis Maxwell* were by order
of the court "dropped from the docket." In rebuttal plaintiffs
introduced the record of an order entered April 17, 1864, in the
circuit court of Ritchie County in case of *Lewis Maxwell, lessee,
&c.* v. *Abraham Cunningham and William Horner, In Ejectment,*

to the effect that Abraham Cunningham, one of the tenants in possession of the premises, had been duly served with a copy of the conditional order made in the cause and not appearing though solemnly called, judgment was rendered against him for the term yet to come of and in the tenement, and a writ of possession awarded the plaintiffs. To the introduction of which order as evidence the defendants objected; which objection was overruled but no exception taken. Plaintiffs also offered in evidence "certain parts of the land books of Murphy district Ritchie County from 1868 to 1891, inclusive, pertaining to the lands that are assessed to Lewis Maxwell in Ritchie County" to the introduction of which defendants objected and excepted. Also a copy of an order of the county court of said county entered April 16, 1897, to which defendants objected, and the objection being overruled, excepted. Said order not found in the record. They also introduced tax receipts for taxes paid on lands, in Murphy district 1868 to 1899 inclusive which was also objected to, overruled and exceptions taken. Various tax receipts showing the payment of taxes on two hundred acres charged to John A. Lowther's heirs for the years 1880, 1882 and 1883, and for the years 1888 to 1898 on one hundred and four acres charged to B. F. Cunningham, all in Murphy district, and for the years 1896-7-8 on ninety-eight and three-fourths acres in name of B. F. Cunningham, also one hundred and ten acres charged in same name for years 1896-7-8 in same district, and on ninety-eight and three-fourths acres in name of Abraham Cunningham's heirs in said district for the years 1892-3-4-5, and fifty acres in name of W. A. Cunningham for 1896 and 1897 in same district.

Much evidence was given on behalf of defendants in endeavoring to prove the location and possession of the lands claimed by them. While plaintiffs introduced witnesses to prove that parts of the lands held by the defendants they admitted belonged to Maxwell, that they had been dispossessed, etc., and also introduced in evidence six letters from B. F. Cunningham to Franklin Maxwell dating from December 16, 1872, to April 26, 1884, in the first says he is still desirous of buying land from him, the land he wants is all in the woods and wants to buy right away so that he could build a house that winter, and asking him if he could not come out, to write him and assure him he could have

it at a fair price and he would go to work on it. The next letter of January 1, is as follows:

"Mr. Maxwell,

Dear Sir there is some people on *indian* Creek that say your land that you bought of Col. Wilson is off the Commissioners books and are talking of having it sold as State land and they say that I will lose all that improvement that I have made on your land that you have promised to sell me there is another party that have been surveying lands on Bridge run and lapped on your land right where I live. Shall I let them have possession of the land that I have improved and held as your land you had better come out and see after your land on *indian* creek if you cant come this winter please write to me when I can see you at home about the land that you have promised me on Bridge run if you will come to *indian* creek I can show you some two hundred acres of land inside of the Clevenger lines which the Wilson lines does not include which you can hold. Now I have *wrote* to you as a friend about your land.

Yours, B. F. CUNNINGHAM."

On November 18, 1873, he wrote as follows:

"Mr. Franklin Maxwell,

Dear Sir I would be glad if you would come out this winter and have that land surveyed for me I have built a house on it last March and moved in it in April and have cleared seven acres and am working on the land as you told me to do last September a year ago and I would like you to come out and run it of for me so that we can draw writings and have it safe if you cant come to see me this winter please write me when to come to see you I can pay you one hundred and fifty dollars down this winter if you come out you can sell some five or six hundred acres here for I know three men that wants to buy land of you I want about two *hundred* acres if we can agree about the payments.

Yours truly,

B. F. CUNNINGHAM."

On March 9, 1878, he wrote the following letter:

"Mr. Franklin Maxwell.

Dear Sir I rec'd your letter yesterday asking about your land in my neighborhood, it is the heirs of John A. Lowther that are claiming land down here inside of your lines, they are claiming

the land under an entry made for John A. Lowther by Abel Sinnett for two hundred and thirty-six acres & their entry is two years younger than the entry made by Stinchcomb for J. D. Wilson and the Lowthe— claim is inside of the Banks lines a large tract of land owned by Lewis Maxwell when I was a little boy which I suppose now belongs to you, the Lowthers sold fifty-one acres off their entry to Mr. Rexroad a *neighbour* of mine and when they went about surveying it they run inside my improvement but I could not find lines nor corners, and I told them then that they were inside of your Wilson lines to say nothing about the Banks lines which was older than any of the entries they are wanting to sell the land that they claim to me it does seem to me that their title cannot be good, does the Banks tract of land now belong to you please let me know if it does I can show you one of the Banks corners and two of the lines. I shall hold on to the land that I believe to be yours until I see you.

Yours truly,

B. F. CUNNINGHAM.

Please write to me immediately.

Will you be at our Circuit Court if you will be there let me know on what day you will be at Harrisville and I will meet you there and give you all the in additional information that I can gather *relation* to your lands.

Yours,

B. F. CUNNINGHAM."

March 23, 1883, he wrote as follows:

"Mr. Franklin Maxwell

Sir I have been here five days waiting to see you to make the down payment and to close the contract on the old Cunningham farm and also to buy the Ruben ———— farm on *indian* creek for another man and now *i* have to go home without seeing you and *i* want you to write to me and let me know when *i* can meet you at home to close this trade.

*yours* with respect,
address

B. F. CUNNINGHAM<br>Smithville, Ritchie Co. W. Va."

April 26, 1884, he wrote as follows:

"Mr. Franklin Maxwell

Dear Sir I returned home that evening I left your place and

seen my brother about fathers old place he says that it is impossible for him to buy it and he wants me to take it off his hands, and I will buy it along with the other I will *git* the plat of the old place and have it ready when you come out and that will save running it out again.   please write to me a few days before you start out here.

Yours truly,

B. F. Cunningham."

B. F. Cunningham admits in his testimony writing all the said letters except the one dated March 23, 1883, written from West Union which he denies having written.   Witness C. W. Rexroad who testifies as to the letters states that he is confident it is B. F. Cunningham's signature.   W. Brent Maxwell testified that when B. F. Cunningham "come to make a purchase of this one hundred and ten acres, one hundred and seven acres on the plat, but it is one hundred and ten acres, he came to where I live in Clarksburg to make a purchase of me and I sold him the land, and I think it was in the winter of 1895 and 1896 that I sold him the land, and I understood that he was a tenant of my father and I told him that I had heard that he was claiming a good deal of my land and had leased three or four hundred acres, and I asked him squarely what amount of land he had then and he told me one hundred and four acres was all he claimed.   That is what he told me.   He said it was all false, that he had not leased it and didn't claim but one hundred and four acres."   B. F. Cunningham was recalled and questioned concerning the letters written by him, but failed to deny the conversation repeated by W. Brent Maxwell.   Barnett F. Cunningham testifies that he wrote the letter of March 23, 1883, from West Union, and when asked "What was your business there" (at West Union) he answered "If you wont bother me I can tell you all about it.   My father sold his home place, ninety-eight and three-fourths acres, to E. N. Ayers.   Afterwards he run the land off, had the deed made and the notes drawn up and give me the deed and the notes to give to E. N. Ayers for him to take up the deed and sign the notes.   Mr. Ayers refused to sign the notes or do anything whatever unless I would go and see Mr. Maxwell and get a deed for the land.   That is what I was there for.   I left the letter in the hands of a lawyer in West Union.   I could not tell his name now."   Said he was a brother of B. F. Cun-

ningham and a son of Abraham Cunningham. So much of the land books of 1897, page 4, Murphy district, as shows the taxation of fifty acres to W. A. Cunningham on Little Indian run derived from W. J. Cunningham, also the books for 1896 showing the same was put in evidence by the defendants. Defendants also with the evidence of B. F. Cunningham introduced in evidence the following letter of Franklin Maxwell to B. F. Cunningham:

"West Union, Feb. 23, 1878.

B. F. Cunningham, Esq.,

Dear Sir, I rec'd your letter in relation to my lands, and will say when I rec'd it I then thought I would go out soon but my family have been sick nearly all winter and I have not been able to leave long at a time & now they are better will have to attend the Lewis & Gilmer courts first and will say as to the Wilson land it was an entry made by Thos. Stinchcomb for J. D. Wilson, Bens father. On the large tract of Lewis Maxwell on which he & I have been paying taxes & when Ben & myself compromised & I have his & Ann Wilson's deed the Comr. struck it off in Wilson name & left the large tract stand as one tax is all a man has a right to pay on the same land under the law, though he may have two or more titles blended for the same land &c. and if you are on my land of course hold on till I see you but if you have made a mistake and got on some other mans land you will have to take your own Judge as a guide, how this is I am not able to say as I never was where you live, have never surveyed around the land in that neighborhood.

*hoo* is claiming the land where you live and under what title do they claim &c. I would be glad to hear all you are able to tell me & will be much obliged to you for any information you can give me about my land & am obliged to you for what you have written & will *gaw* out there as soon as I can but cannot now say when.

Yours truly,

Franklin Maxwell."

In *Sheff* v. *Huntington,* 16 W. Va. 307, syl. pt. 13, it is held: "Where a case has been fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the court unless manifest wrong and injustice have been done, or unless the verdict is plainly not warranted by the evidence or facts proved." *Black* v. *Thomas,* 21 W. Va. 709; *Blosser* v. *Harsh-*

*barger,* 21 Grat. 216; *Miller* v. *Insurance Co.,* 12 W. Va. 116; *Voss* v. *King,* 38 W. Va. 607; 41 W. Va. 481.

The third assignment is as to giving plaintiffs' instruction No. 2 which refers to plaintiffs' instruction No. 1, the latter set out in bill of exceptions No. 6 and the former in bill of exceptions No. 7, the instruction No. 1 is the subject of the eighth assignment of error. This instruction No. 1 was asked by the plaintiffs to propound to the jury the law regarding the claim of defendants as to their adverse holding of the premises sued for, it is not disputed that this is the law but "that it ignores the fundamental doctrine that the plaintiff must recover on the strength of his own title." The jury was fully instructed on that doctrine by the court at the instance of the defendants by their instructions No. 2 and No. 6 which were given without objection and it was wholly unnecessary to reiterate it the third time. One claiming title as against the legal owner is bound to show his color or claim of title and that it covers the land or part of the land in controversy, and that he entered under said color or claim of title upon the land in controversy or some part of it; that his entry was hostile and adverse to the party having the legal title, and was actual, visible and exclusive, and must have so continued, hostile, actual, visible and exclusive, unbroken under said color or claim of title for ten years before the commencement of the action against him. Thus the law is laid down in *Core* v. *Faupel,* 24 W. Va. 238, and so held by this Court many times since.

. Instruction No. 2 refers to No. 1 and simply instructs the jury that one so holding under *claim* of title for ten years before commencement of action will be limited to his actual enclosure; if under *color* of title, the adverse holding will extend to the boundaries of the deed or writing that constitutes his color of title. The claim of plaintiff in error that this instruction is misleading cannot be well taken when the instruction is so clearly proper in so far as the evidence shows that any part of the lands held by the Cunninghams or any of them interfered with the four hundred acres sued for by plaintiffs. The fourth and fifth assignments go to the instruction No. 5 given to the jury at the instance of the plaintiffs and is set forth in the bill of exceptions No. 9. Plaintiff in error gives as his objection to this instruction "that it tells the jury that if the plaintiffs paid taxes on coterminous tracts of land to the one in controversy, they have

paid on the one in controversy." Such construction cannot be placed upon this instruction and no reasonably intelligent jury would so understand it, on the contrary, it simply tells the jury that if a small or any number of small tracts lying contiguous to each other are charged in the aggregate as one tract they need not in addition be charged again as separate tracts. The State only wants land to be taxed once, and if many tracts are charged together as one it is sufficient. It is insisted by plaintiffs in error that the evidence shows that plaintiffs never had the four hundred acres in controversy on the land books of Ritchie County. It is clearly shown in the evidence as hereinbefore stated that there were charged to Lewis Maxwell's heirs in Murphy district in said Ritchie County from 1869 to 1896 inclusive besides some smaller tracts, two tracts of four thousand two hundred and seventy and five thousand seven hundred and sixty acres respectively and a part of that time a tract of two thousand and eighty-eight acres, and since 1896 in smaller tracts ranging from eight hundred acres down. Now whether the four hundred acres was charged as part of one of the large tracts or charged separately it matters not, so it was charged, and it is also shown that the taxes were paid as charged. In *Overton* v. *Davisson,* 1 Grat. 211, syl. pt. 6, it is held: "Upon the question of adversary possession, it is immaterial whether the land in controversy, is embraced by one, or several coterminous grants of the older or younger patentee; in either case the land granted to the same person by several patents, is to be regarded as forming one entire tract." Section 14, chapter 29, Code; Acts 1881, chapter 12. If the land sued for was included in any of the large tracts upon the land books as shown it was not forfeited. If the jury had found that it was forfeited they must have found for the defendants, because they were thoroughly instructed by the court at the instance of defendants to that effect. As well suggested by defendants in error "the jury was composed of men living in Ritchie County, acquainted with the streams and the location of the land and the manner of keeping the land books, and heard the evidence and upon their oaths, said in effect, that the land in controversy was upon the land books all these years and the taxes paid thereon."

The sixth assignment of error goes to the giving of instruction No. 6 at the instance of the plaintiffs. This instruction was properly given for the reason that if the defendants rely upon

setting up an outstanding title whether in the State by forfeiture or otherwise they must clearly prove such title or forfeiture. The seventh assignment is as to instruction given for plaintiffs No. 8 which states the law as to adverse holding. That it must have been adverse from its inception or an express disclaimer or its equivalent and the assertion of an adverse title with notice to the owner. This is the law as laid down in the case of *Core* v. *Faupel, supra,* and the instruction is applicable here because of the letters written by B. F. Cunningham to Franklin Maxwell, and the evidence of declarations of Cunningham and others that his claim to the land in controversy was under Maxwell. The ninth assignment of error that the court erred in refusing to give defendants instruction No. 5. This instruction would have been unintelligible to the jury as it refers to a section of the constitution without in any way informing the jury of the law embraced in the article and section referred to. The tenth, eleventh, eighteenth and nineteenth assignments all bear upon the question of the burden of proof which defendants insist is upon plaintiffs to prove the entry on the land books of the land in controversy and the non-forfeiture thereof to the State, the defendants relying upon the forfeiture of the plaintiffs' title for their defense. In Newell on Ejectment, 653, s. 15, the law is stated as follows: "The plaintiff having in the first instance established his right to the possession of the land in controversy, by showing a *prima facie* title it is incumbent on the defendant, if he relies upon an outstanding title for the purpose of defeating the action, to positively and clearly establish such title as an actual and subsisting and better title than the plaintiff's title —such title as would enable the third party himself to maintain an action for the possession of the lands in controversy against both the plaintiff and defendant," and cases there cited; *Coal Co.* v. *Howell,* 36 W. Va. 489. Instruction No. 8 was not only improper on that ground and properly refused but it was further repeating the instructions given at the instance of defendants No. 2 and No. 6 as to the law requiring plaintiffs to recover on the strength of their own title and not on the weakness of the title of their adversaries, and it was also defective as to the adverse possession of the defendants for ten years under color or claim of title because it did not define the extent to which color of title would refer or claim of title would extend and in effect instructed the jury if the defendants or any one of them had held

such possession of any tract or part of a tract for that time, that they were entitled to the whole of the land in controversy. The twelfth assignment of error that the court permitted the case to go on as to trial for one day without a plea of not guilty. The record shows that the pleading was made up at rules when all the defendants pleaded not guilty, they afterwards again pleaded not guilty in open court and after the impaneling of the jury and hearing some testimony on the first day of the trial two of the defendants by their counsel in open court withdrew distinctly their plea of not guilty entered in the cause in open court on the day before but did not withdraw the same plea entered at rules. On the day following the withdrawal of the plea the same defendants moved to continue the cause as to them which motion was overruled, said defendants then again entered the plea of not guilty and the trial proceeded, so that it appears from the record that no part of the trial proceeded in the absence of a plea of not guilty. As to the motion for a continuance it is addressed to the sound discretion of the court and while the appellate court will supervise the action of the trial court on such motions it will not reverse its judgment on that ground unless such action was plainly erroneous. *Amos* v. *Stockert*, 47 W. Va. 109; *Bank* v. *Hamilton*, 43 *Id.* 75, (27 S. E. 260); *Marmet Co.* v. *Archibald*, 37 *Id.* 778, (17 S. E. 299); *Buster* v. *Holland*, 27 *Id.* 511; *Logie* v. *Black*, 24 *Id.* 21; *Riddle* v. *McGinnis*, 22 *Id.* 253; *State* v. *Harrison*, 36 *Id.* 730; *State* v. *Lane*, 44 *Id.* 730; *State* v. *Emblem*, 46 *Id.* 326. There is nothing in the record to show that the defendants were in any way injured by requiring the case to proceed.

The thirteenth assignment that the court erred in holding that the plaintiffs had sufficiently identified their land by their title papers when, as matter of fact, such title papers did locate their land in another and different locality than that of the land in controversy. The evidence of the location and identification of the land as given by the surveyor and his assistants, and the fact that the defendants themselves pointed out the beginning corner of the Marsh and Waldo tract and the parties all agreeing upon said corner is too well fixed to make this assignment tenable.

The fourteenth assignment that the court erred in not treating the injunction proceedings in regard to this land as an injunction perpetuated. The defendants offered some evidence concerning an old ejectment suit of Lewis Maxwell against

Abraham Cunningham. They show no valid title to the ninety-eight and three-fourths acres in the Cunninghams, the old Clevenger agreement introduced between Clevenger and Abraham Cunningham was not a conveyance of the land. They show that Lewis Maxwell had judgment for this tract of land against Abraham Cunningham but that Maxwell was enjoined from taking possession under his judgment and it does not appear that the injunction was ever dissolved nor does it appear that the Cunninghams or any of them ever claimed the land as against Lewis Maxwell or Frank Maxwell who afterwards became the owner of it. While the injunction was still in force and Abraham Cunningham had no title to the land, in March, 1883, Barnett F. Cunningham wrote to Franklin Maxwell wanting to buy the "old Cunningham farm" from him and on the 26th of April, 1884, B. F. Cunningham wrote to Franklin Maxwell that he had seen his brother "About father's old place he says that it is impossible for him to buy it and wants me to take it off his hands, and I will buy it along with the other I will get the plat of the old place and have it ready when you come out and that will save running it out again." About that time E. M. Ayers was on the old Cunningham tract and would not pay for it under a sale from Abraham Cunnnigham because Cunningham had no title. The defendants introduced in the case record of suit of B. F. Cunningham against J. B. Hallam, sheriff, in which suit it was shown by the testimony of Nancy Ayers, the mother of E. M. Ayers, that after E. M. Ayers learned that Abraham Cunningham could make no deed for the land that they held possession of the same under Franklin Maxwell. There is evidence tending to show, including the statements of Abraham Cunningham, that for a time his possession to said ninety-eight and three-fourths acres was broken he being out of possession for some time, and if such possession was so broken and had been adversely held against the Maxwells it would be a fair question for the jury whether such adverse possession again commenced before the sale was made and possession given by special commissioner Showalter in the said case of B. F. Cunningham against J. B. Hallam, sheriff, which deed from Showalter to D. M. Philips under decree in said cause dates the 10th day of March, 1896. The fifteenth assignment assuming that the defendants had had ownership and adverse possession for fifty years of the land in controversy, which fact is claimed to be well estab-

lished by the evidence, has been disposed of by the treatment of the last preceding assignment. The sixteenth assignment that the court erred in overruling the demurrer to the declaration is not insisted on by plaintiffs in error in their brief and the declaration seems to be entirely sufficient. The seventeenth assignment that the court erred in holding that payment of taxes on one tract of land is a payment on another if it be coterminous, has been disposed of under assignments fourth and fifth which raise the questions which I suppose, are intended to be hinted at in the said seventeenth asignment. The twentieth assignment that the court erred in holding that the plaintiffs could recover a part and not all the land sued for as the possession of the defendants did and would extend to the boundaries of the four hundred acres mentioned in the declaration of the plaintiffs. The declaration only described the four hundred acres, part of the Marsh and Waldo survey of nine hundred and sixty acres which was sold as forfeited and purchased by Maxwell, which tract sued for did not include all of the ninety-eight and three-fourths acres so that the whole of the last mentioned tract was not sued for and of course could not be recovered in the action and plaintiffs explain that "when the suit was commenced the plaintiffs did not know all the facts applicable to this tract, consequently, it was not all included in the declaration, but only that part of it that lapped on to the four hundred acre tract sued for."

In their brief the plaintiffs in error raise the question as to whether it is not error not to have entered judgment in favor of the defendant B. F. Cunningham for the land found for him by the verdict of the jury and if this was error whether it could be corrected. The finding of the jury for the defendant a particularly described part of the land sued for is mere surplusage and the judgment of the court thereon would be of no avail because the defendant is already in possession of the land sued for and not recovered by the plaintiff, and he holding it as against the plaintiff. I see no reversible error in the judgment and the same is affirmed.

*Affirmed.*